ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 20-00378 CRB |
|     Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| DINA GARTSMAN, | Date: June 14, 2023 |
|     Defendant. | Hon. Charles R. Breyer |

## I. INTRODUCTION

The question posed to the Court by this sentencing is a difficult one: what is the appropriate punishment for a defendant who sold large quantities of a drug she knew to be deadly, but who was herself addicted to fentanyl, has minimal prior criminal history, and has—despite her addiction—made major progress in the nearly three years since this case was charged? The question is made more difficult by the fact that the Defendant's husband, Brian Rabbitt, was charged separately and, rather than be sentenced to prison, referred to the ATIP program over the government's objection. *See United States v. Rabbitt*, 20-cr-335 WHA. The government believes that Mr. Rabbitt, who had a lengthy

criminal history, was the impetus for the criminal behavior in this case. If he received ATIP, and Ms. Gartsman is not eligible for the same, what is the appropriate punishment?

Dina Gartsman comes before this Court to be sentenced on charges of distribution of fentanyl. As this Court is well-aware, the last few years have seen fentanyl wreak havoc on our community in an unprecedented manner, causing thousands of deaths and untold misery and destruction. On multiple occasions, Gartsman sold an ounce of fentanyl to a Confidential Source for more than $2,000 an ounce. The evidence in this case, described in more detail below, shows that when she sold the fentanyl, the defendant knew how dangerous and deadly it was.

The parties agree that the Total Offense Level in this case is 21. The government notes here that the defendant has not yet Safety Valve proffered. If she chooses to do so before sentencing, she would receive an additional two points off, and the parties will update the Court if and when that happens. The Defendant is in Criminal History Category II. As a result, the appropriate advisory Guidelines range is 41-51 months' imprisonment. Probation recommends a variance to a sentence of 41 months, the low-end of the Guidelines. The government declines to make a sentencing recommendation in this case. The conduct in this case was extraordinarily dangerous and could have proven deadly, but there are mitigating factors present that the Court must consider. Whatever sentence the Court chooses to impose, the government asks that it be followed by three years of supervised release.

## II.     OFFENSE CONDUCT

The PSR accurately sets forth much of the conduct in this case, but it leaves out some key details. PSR ¶¶ 8-34. The conduct in this case can be split into two parts: before and after Brian Rabbitt went into state custody in November 2019. In the first period, Rabbitt was the primary dealer of fentanyl. When he entered custody, the second stanza began, and his wife, the defendant in this case, took over selling fentanyl.

### A.     Part One: Rabbitt Sells Fentanyl to a Confidential Source

In early August 2019, a Confidential Source ("CS") working with law enforcement reached out to Rabbitt to obtain a sample of fentanyl. The CS knew previously that Rabbitt was a fentanyl dealer. On August 5, 2019, Rabbitt told the CS where to retrieve the sample. After doing so, the defendant (Gartsman) and Rabbitt called the CS. Gartsman can be heard on the recording of that call instructing

the CS to not take all of the fentanyl at once.  Rabbitt quickly adds a warning to the CS on the call, saying, "You'll die."  This clearly shows that Gartsman and Rabbitt were aware that the fentanyl provided to the CS was extremely dangerous and could cause an overdose death.  This is not a case, then, where the defendants can claim that they did not know fentanyl's potency and potential to cause death.

Days after obtaining the free sample, the CS purchased an ounce of fentanyl from Rabbitt for $2,160.  On August 16, 2019, the CS and Rabbitt conducted the narcotics transaction in the middle of the day in the Mission neighborhood of San Francisco.  A little more than a month later, on September 23, 2019, Rabbitt again sold the CS one ounce of fentanyl, this time for $2,000 in cash.  At that transaction, the CS asked the defendant about the quality of the fentanyl and Rabbitt responded that he "only got the best."

**B.     Part 2: Gartsman Takes Over Fentanyl Sales to the CS**

In or around November 2019, Rabbitt entered state custody on unrelated charges.  Based on the content of jail calls obtained by the government, law enforcement believes that when Rabbitt was taken into state custody, his wife, Ms. Gartsman, took over their fentanyl distribution operation and made at least three more sales of an ounce of fentanyl to a confidential informant.  Rabbitt and the defendant discussed their fentanyl distribution operation on recorded jail calls and Rabbitt advised Gartsman on how to sell narcotics.

Beginning in or around December 2019, Gartsman took over the fentanyl sales while Rabbitt was in custody.  As set forth in the PSR, on a call with the CS, Gartsman explained that she would sell the CS fentanyl, and that she and Rabbitt had opened a fictitious salon in the Sunset District of San Francisco to produce a new batch of fentanyl.  PSR ¶¶ 19-20.  The government investigated this claim but found no evidence to support its veracity.  Nevertheless, in January 2020, Gartsman began selling fentanyl directly to the CS.  On January 9, 2020, she sold an ounce of fentanyl to the CS for $2,000.  Again, on February 7, 2020, Gartsman sold another ounce of fentanyl to the CS for another $2,000.  At this deal, Gartsman bragged about the quality of the fentanyl, telling the CS that it was "completely clear" and that there was "like no cut in it."  PSR ¶ 29.  She told the CS that the fentanyl she sold was safe to inject.  In other words, Gartsman plainly knew about the quality of the fentanyl she sold, so this

is not a case like many the Court sees where the defendant is unaware of the potency of the narcotics distributed.  Finally, on February 19, 2020, the defendant again sold the CS one ounce of fentanyl for $2,000.  In total, the defendant is responsible for selling approximately 75 grams (a little less than three ounces) of fentanyl.  While an ounce of fentanyl might not sound like a large amount, the potency of fentanyl shows that it is a significant quantity. According to the DEA case agent, two milligrams of fentanyl is enough to cause an overdose death.  One ounce of fentanyl, therefore, is more than 28,000 potentially lethal doses. That means that the defendant intended to distribute more than 84,000 potentially deadly doses of fentanyl into our community order to make a significant profit.

The end of the government's investigation is not described in the PSR.  In July 2020, federal law enforcement conducted surveillance on Rabbitt (after he was released from state custody) and Gartsman. Agents surveilled them as they traveled from their apartment to a Home Depot and purchase goods worth nearly $1,000 using payment cards belonging to other people.  On August 12, 2020, agents executed a search warrant at their home, and found multiple ID cards and credit/debit cards belonging to other individuals, suggesting that Rabbitt and Gartsman were involved not only in narcotics trafficking but also identity theft.  No charges were filed related to this conduct as Gartsman chose to resolve her case quickly.

The defendant was charged by Information on October 7, 2020 and waived Indictment.  Dkt. No. 1.  She pled guilty pursuant to a plea agreement on December 16, 2020 to one count of distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), a charge that does not carry a mandatory minimum sentence.  Dkt. No. 8.  Since then, sentencing has been delayed multiple times, due in part to the Covid-19 pandemic, Gartsman's substance abuse and efforts at recovery, and allowing her husband's case to resolve, which did in December 2022 with a referral to the ATIP program.  The parties are now ready to proceed with sentencing.

### III.   GUIDELINES CALCULATIONS

In the PSR, Probation calculates the defendant's offense level as follows:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2D1.1(c)(8) | 24 |
| Acceptance of Responsibility, U.S.S.G. § 3E1.1 | -3 |
| Adjusted Offense Level | 21 |

U.S. SENTENCING MEMO.
CR 20-00378 CRB
4

As stated above, the defendant may choose to Safety Valve Proffer before sentencing, but she has not done so yet. If she does, she would receive a further two-point reduction pursuant to U.S.S.G. § 5C1.2 and 2D1.1(18). In that case, the defendant's Total Offense Level would be 19 and the appropriate Guidelines range would be 33-41 months. If the defendant proffers with the government and admits her conduct before the June 14, 2023 sentencing date, the government will update the Court accordingly.

## IV.   SENTENCING RECOMMENDATION

### A.   Applicable Law

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991. A sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment to the offender, deter the defendant and others from committing similar crimes in the future and protect the community from future crimes of the defendant. 18 U.S.C. § 3553(a)(2). The Guidelines should be the starting point and the initial benchmark. *Gall v. United States*, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

### B.   Analysis of the Factors Set Forth in 18 U.S.C. § 3553(a).

The defendant engaged in extremely dangerous behavior when she sold distribution amounts of what she knew to be potentially deadly fentanyl to a CS on multiple occasions, making more than $6,000 in profit (and more than $10,000 total when including the $4,000 made by Rabbitt). When the defendant provided the CS with a sample of fentanyl before the first sale, the defendant and her husband warned the CS that if the CS took it all, "You'll die." In other words, the defendant knew that fentanyl is

extremely potent and can cause fatal overdoses, yet he chose to sell it anyway in search of profit. In so doing, the defendant put this community at grave risk. In fact, the defendant is lucky that she sold the fentanyl to a CS working for law enforcement. If she had instead sold it to another drug dealer as intended, she would have been disseminating tens of thousands of potentially lethal doses of fentanyl in our community, and might be before the Court today being responsible for one or multiple overdose deaths.

As the Court knows, fentanyl is a synthetic opioid at least 30 times more potent than heroin and its abuse has become alarmingly more prevalent and exponentially more dangerous in recent years. From May 2019 to May 2020, the United States recorded 81,230 drug overdose deaths, which was "the largest number of drug overdoses ever recorded" in a twelve month period. As reported by the CDC, "[s]ynthetic opioids are the primary driver of the increases in overdose deaths" and "the increase in synthetic opioid-involved overdoses is primarily linked to illicitly manufactured fentanyl."[1] The fentanyl the defendant sold could have caused numerous overdoses if it had reached the hands of users. It most certainly would have contributed to more addiction, pain, and misery for those who used it. The defendant knew how dangerous fentanyl was and chose to sell it anyway, not caring about the consequences for those who might have taken it and potentially overdosed. Moreover, the evidence of identity theft shows that the defendant and her husband had no qualms about harming others in the pursuit of profit. This is serious and dangerous conduct that deserves punishment.

However, there are mitigating factors in this case that the Court must consider. Most importantly, the defendant was addicted to opioids, including fentanyl, while she was selling it. As set forth in the PSR, the defendant was using fentanyl daily throughout the time of the criminal conduct up to and until her arrest. PSR ¶ 76. That is no excuse for selling deadly drugs, and the amount of fentanyl she sold is more than enough to have fed her habit. Still, there is no question that opioids contributed to her conduct in this case. Moreover, the government has seen firsthand that the defendant has worked hard on her sobriety since these charges were filed. While she had some missteps at the outset, the defendant has dramatically improved her behavior and appears to be sober and doing well. The

---

[1] Centers for Disease Control and Prevention, HAN00438 (published Dec. 17, 2020), https://emergency.cdc.gov/han/2020/han00438.asp.

government believes this defendant has the potential to live a productive and law-abiding life if she is able to remain sober and hopes that she can do so.

It is also true that the defendant has minimal criminal history, having only been sentenced to six days in jail and three years' probation for a misdemeanor offense in 2016. Finally, the defendant accepted responsibility quickly and the government believes her remorse—aided in no small part by her sobriety—is real.

Finally, as the Court knows, 18 U.S.C. § 3553(a)(6) instructs the Court to avoid unwanted sentencing disparities. The government acknowledges that a prison sentence in this case would arguably run afoul of the statute based on the resolution of the defendant's husband's case. Brian Rabbitt was charged separately for the conduct described above. *See United States v. Rabbitt*, 20-cr-00335 WHA. Rabbitt fell in Criminal History Category VI, and the government believes based on the evidence that it was Rabbitt who was the instigator of the fentanyl dealing, and that Rabbitt instructed and coached his wife, the defendant, on how to deal drugs. He was, in short, the most culpable defendant of the two. At sentencing, the government requested a custodial sentence of 66 months for Rabbitt. However, over the government's objection, Rabbitt's sentence was deferred and Judge Alsup assigned him to the ATIP program (now called CAP) on November 15, 2022. Dkt. No. 88. Rabbitt is currently enrolled in the program.

The government defers to the Court on how best to handle this potential disparity. There is no question that the defendant and her husband committed serious crimes. There is also no question, based on the conduct and the criminal histories, that Rabbitt is more culpable than Gartsman. While the government did not believe that Rabbitt was a suitable candidate for ATIP, the Court in his case disagreed and the government respects the Court's decision. Therefore, the government declines to make a sentencing recommendation in Gartsman's case.

**V.   CONCLUSION**

The defendant in this case sold drugs that she knew to be deadly to a Confidential Informant. Had those drugs entered our community, there is little doubt they would have caused death, overdose, and destruction. Fentanyl is a plague on our community, and the defendant played a part in its spread. She should be punished accordingly. However, there are unique mitigating factors in this case that the

Court should consider. Therefore, the government declines to make a sentencing recommendation, and asks that no matter what the sentence, the Court impose a term of three years of supervised release and a $100 special assessment.

DATED: June 7, 2023                             Respectfully submitted,

                                                ISMAIL J. RAMSEY
                                                United States Attorney


                                                            /s/
                                                ROSS WEINGARTEN
                                                Assistant United States Attorney